**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| Thomas Jefferson University dba Jefferson Health and Lehigh Valley Physician Hospital Organization, Inc., | Civil Case No. _____ |
| Plaintiffs, | **COMPLAINT** |
| v. | |
| Aetna Health Inc., | |
| Defendant. | |

Plaintiffs Thomas Jefferson University dba Jefferson Health ("Jefferson Health") and Lehigh Valley Physician Hospital Organization, Inc. ("LVPHO") (collectively, the "Hospitals" or "Plaintiffs"), by and through their attorneys, by way of Complaint for Declaratory and Injunctive Relief against the Defendant Aetna Health Inc. ("Aetna" or "Defendant") allege as follows:

## INTRODUCTION

1. This dispute arises from Aetna's violation of federal law and failure to comply with the terms of the written agreements between Jefferson Health and Aetna and LVPHO and Aetna through its implementation of the Aetna "Level of Severity Inpatient Payment Policy" (the "Policy").

2. Beginning on January 1, 2026, pursuant to the "Policy," Aetna has engaged in improper denials and/or underpayments for inpatient hospital care that the Hospitals have provided and continue to provide to members of Aetna Medicare Advantage plans.

3. The contracts require Aetna to comply with all applicable laws and regulations. But Aetna's "Policy" violates the Centers for Medicare & Medicaid Services' ("CMS") Two Midnight

Rule.  Since 2013, the Two Midnight Rule has defined what inpatient services the Medicare program covers.  Medicare Advantage plans (i.e., Medicare managed care plans offered by private Medicare Advantage Organizations to individuals who elect Medicare Part C) must provide no less coverage to Medicare Advantage beneficiaries than traditional Medicare.  They must provide that coverage through payment for the covered services.

4.     Aetna's "Policy" denies coverage and payment for inpatient services the Hospitals provided to Aetna's Medicare Advantage members that the Two Midnight Rule defines as inpatient services.

5.     Pursuant to its "Policy," while Aetna "authorizes" the inpatient stay (and thus does not actually deny the inpatient admission), Aetna adjusts the payment to a lower reimbursement rate if Aetna decides that certain "level of severity" criteria are not met for that inpatient stay.  As a result, Aetna is able to tell its Medicare Advantage members (and CMS) that it is "covering" the inpatient admission, while simultaneously paying the Hospitals for the equivalent of outpatient observation care.  But the Hospitals' contracts with Aetna provide *one* rate for inpatient services, not two rates from which Aetna gets to choose, depending on its judgment as to the "level of severity."

6.     In public notifications and in correspondence with the Hospitals, Aetna characterizes its "Policy" as a "payment policy" in an attempt to circumvent the requirements of the Two Midnight Rule and the parties' contractual obligations.  But in reality, the "Policy" is a unilateral amendment to the parties' contracted rates for inpatient services and a violation of the federal Two Midnight Rule, as further alleged below.  Aetna cannot change negotiated reimbursement rates by issuing a new policy.  Changing reimbursement rates under the parties'

2

agreements requires written amendments signed by both parties. Aetna's "Policy" also violates federal law.

## THE PARTIES

7. Plaintiff Jefferson Health is a nonprofit health system existing under the laws of the Commonwealth of Pennsylvania with its principal place of business at 111 South 11th Street, Philadelphia, PA 19107. Jefferson Health and its 33 hospitals serve patients throughout the Delaware Valley.

8. Plaintiff LVPHO, now known as Valley Preferred, is a physician-hospital organization that is a partnership between Lehigh Valley Health Network and the Greater Lehigh Valley Independent Practice Association. As of August 2024, Lehigh Valley Health Network joined Jefferson Health, but Valley Preferred remains a distinct entity for purposes of the physician-hospital organization. LVPHO exists under the laws of the Commonwealth of Pennsylvania with its principal place of business at 1605 N. Cedar Crest Blvd., Ste. 411, Allentown, PA 18104.

9. On information and belief, Defendant Aetna Health Inc. is a Pennsylvania corporation with its principal place of business at 1425 Union Meeting Road, Blue Bell, PA 19422. On information and belief, Aetna issues health insurance and administers group health plans in Pennsylvania, including Medicare Advantage plans. Aetna may be served with process by serving its registered agent for service The Corporation Trust Company, 600 N 2nd St., Ste. 401, Harrisburg, PA 17101.

10. On information and belief, Aetna operates Medicare Advantage plans in Pennsylvania.

**JURISDICTION AND VENUE**

11.     This Court has jurisdiction over this dispute under 28 U.S.C. § 1331 because the Hospitals assert claims based on federal law against Aetna.  This lawsuit is an action for injunctive and declaratory relief only.

12.     This Court has supplemental jurisdiction over the Hospitals' state law claims pursuant to 28 U.S.C. § 1367 because all claims alleged herein form part of the same case or controversy under Article III of the United States Constitution.

13.     This Court has personal jurisdiction over Aetna because Aetna regularly conducts business in Pennsylvania and has engaged in the conduct herein in Pennsylvania targeted toward Pennsylvania residents, business, and/or interests.

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this judicial district and because Aetna conducts a substantial amount of business in this judicial district.  In addition, many of Aetna's health plans, customers, and members can be found within this district.

**FACTUAL ALLEGATIONS**

*I.        The Agreements*

**A.  The Jefferson Health Agreement**

15.      Effective April 1, 2016, Aetna (on behalf of itself and its Affiliates) and Jefferson Health entered into a written Hospital Service Agreement ("Jefferson Health Agreement").

16.     The Jefferson Health Agreement covers services provided by Jefferson Health to members of Aetna's commercial and Medicare Advantage plans.

17.     Pursuant to Section 3.2 of the Jefferson Health Agreement, Aetna agrees to "remain throughout the term of this Agreement, substantially in compliance with all applicable Federal and

4

state law and regulations related to this Agreement and the services to be provided under this Agreement . . . ."

18. Moreover, the Medicare Advantage Product Addendum, attached to the Jefferson Health Agreement, states: "In consideration of Provider's agreement to perform Covered Services in accordance with the Agreement, Provider shall be paid for Covered Services performed according to the terms of the applicable Service and Rate Schedule." The Service and Rate Schedule includes reimbursement rates for inpatient services.

19. Pursuant to Section 4.1.6(k) of the Jefferson Health Agreement, as to Medicare Advantage plans or products, Aetna is permitted to implement a utilization management process, but the concurrent review "shall begin upon such time as the length of stay of a given Hospital admission reaches ten (10) days ('LOS Threshold'); provided, however, that such review shall be limited to and apply only to care and dates of service that occur after the LOS Threshold."

20. Pursuant to Section 9.2 of the Jefferson Health Agreement, "no changes, amendments, or alterations [to the contract] shall be effective unless signed and agreed to by duly authorized representatives of both Parties, except as expressly provided herein."

21. The Medicare Advantage rates that Aetna owes to Jefferson Health for services provided to Aetna's Medicare Advantage members are set forth in the Jefferson Health Agreement and corresponding Amendments.

22. In addition, the Medicare Advantage Product Addendum to the Jefferson Health Agreement provides that "In the event that a Company [Aetna] policy or procedure conflicts with a provision in the Agreement, then the language in the Agreement (including all amendments, exhibits, and attachments thereto) shall govern." Section E, Medicare Advantage Product Addendum.

**B. The LVPHO Agreement**

23. Effective April 1, 2023, Aetna (on behalf of itself and its Affiliates) and LVPHO entered into a written Physician Hospital Organization Agreement ("LVPHO Agreement").

24. The LVPHO Agreement covers services provided by LVPHO hospitals and providers to members of Aetna's commercial and Medicare Advantage plans.

25. Pursuant to Section 3.2.3 of the LVPHO Agreement, Aetna agrees to "remain throughout the term of this Agreement, in compliance with all applicable Federal and state laws and regulations related to this Agreement and the services to be provided under this Agreement, including without limitation, any applicable prompt payment statutes and regulations and Pennsylvania Public Act 146, as it may be amended from time to time."

26. Moreover, the Medicare Advantage Product Addendum, attached to the LVPHO Agreement, states: "Reimbursement under this Addendum shall be made in accordance with the applicable Service and Rate Schedule in the Agreement." The Service and Rate Schedule includes reimbursement rates for inpatient services.

27. Section 1.15 provides: "In determining the appropriateness of inpatient care for Medicare Advantage patients, Plan will follow the Two Midnight Rule as enunciated in 42 C.F.R. § 412.3."

28. Pursuant to Section 9.2 of the LVPHO Agreement, "no changes, amendments, or alterations [to the contract] shall be effective unless signed and agreed to by duly authorized representatives of both Parties, except as expressly provided herein."

29. The Medicare Advantage rates that Aetna owes to LVPHO for services provided to Aetna's Medicare Advantage members are set forth in the LVPHO Agreement and corresponding Amendments.

6

**II.** **_Federal Laws and Regulations Applicable to Coverage and Payment for Inpatient Hospital Care_**

30. The Agreements require Aetna to comply with all applicable laws and regulations. In addition, the LVPHO Agreement expressly obligates Aetna to "follow the Two Midnight Rule as enunciated in 42 C.F.R. § 412.3."

31. Medicare Advantage plans are required to provide no less than the benefits required by traditional Medicare. Since 1997, federal law has required Medicare Advantage plans to cover the same items and services available under traditional Medicare Part A – which includes inpatient care – and Part B. *See* Social Security Act § 1852, 42 U.S.C. § 1395w-22 (1997).

32. Further, CMS regulations confirm Medicare Advantage plans' obligations to provide Part A benefits and define those to include inpatient care under the Two Midnight Rule.

33. In 1998, CMS promulgated 42 C.F.R. § 422.101 (hereinafter, "Section 422.101"). Section 422.101 is titled "Requirements relating to basic *benefits*." (emphasis added). The original version, enacted in 1998, reads, in pertinent part:

> **[E]ach M+C organization [n/k/a MA Organization] must—**
>
> **(a) Provide coverage of, through the provision of or payment for, all services that are covered by Part A and Part B of Medicare** . . . .; and
>
> (b) Comply with—
>
> (1) HCFA's [n/k/a CMS] national coverage determinations . . . .

(emphasis added).

Thus, from the start, Medicare Advantage plans have had to provide "benefits" through "payment" for all services that are "covered" by Medicare Part A.

34. While Section 422.101 has been amended several times, the requirement that Medicare Advantage plans provide "benefits" through "payment" for all services that are

"covered" by Medicare Part A has remained throughout.  *See* 42 C.F.R. § 422.101 (2000) (confirming that Medicare Advantage plans must, among other things, also comply with CMS's national coverage determinations, manuals, guidelines, and instructions); 42 C.F.R. § 422.101 (2005).

35.     Effective 2013, CMS adopted 42 C.F.R. § 412.3, which is titled "Admissions." This regulation defining hospital admissions contains, among other things, the Two Midnight Rule. Section 412.3 provides that "an inpatient admission is generally appropriate for *payment* under Medicare Part A when the admitting physician expects the patient to require hospital care that crosses two midnights." 42 C.F.R. § 412.3(d)(1) (emphasis added).  In making this judgment, the physician evaluates such factors as "patient history and comorbidities, the severity of signs and symptoms, current medical needs, and the risk of an adverse event." *Id.* Thus, under Traditional Medicare, a hospital is entitled to payment for benefits as inpatient services when the admission meets the definition of the Two Midnight Rule.

36.     In the preamble to the Final Rule in 2013, CMS explained that the Two Midnight Rule relates to inpatient services under Medicare Part A, stating: "[F]or those hospital stays in which the physician expects the beneficiary to require care that crosses 2 midnights and admits the beneficiary based upon that expectation, Medicare Part A payment is generally appropriate." 78 Fed. Reg. 50,496, 50,506 (Aug. 19, 2013).

37.     When it promulgated Section 412.3, CMS explained in the Federal Register that the Two Midnight Rule sought to clarify the distinction between inpatient and observation for the Medicare program, to "reduce uncertainty regarding the requirements for *payments* to hospitals and [critical access hospitals] *under Medicare Part A* related to when a Medicare beneficiary should be admitted as a hospital inpatient, in this final rule." 78 Fed. Reg. at 50,506 (emphasis

8

added). CMS had previously explained that Section 412.3 was adopted to avoid uncertainty and variation in reimbursement decisions that had arisen under its prior policy for evaluating the reasonableness of inpatient admissions. *See* 78 Fed. Reg. 27,486, 27,648 (May 10, 2013).

38. Once CMS created the Two Midnight Rule to define hospital inpatient benefits under Part A, the Two Midnight Rule became something Medicare Advantage plans had to follow, pursuant to Congress' original 1997 directives in the Social Security Act and reinforced in CMS's original 1998 directives in Section 422.101.

39. On April 12, 2023, CMS reaffirmed, in the Federal Register, what CMS explained to be "***its longstanding policy*** that MA organizations may only apply coverage criteria that are ***no more restrictive*** than Traditional Medicare coverage criteria . . ." 88 Fed. Reg. 22120, 22189 (April 12, 2023) ("2023 Final Rule") (emphasis added).

40. In the 2023 Final Rule, CMS confirmed that where Medicare coverage criteria exist, Medicare Advantage plans must apply those Medicare coverage criteria and may not adopt more restrictive standards. Because the Two Midnight Rule is a Medicare coverage criterion applicable to inpatient determinations (2023 Final Rule, at 22194), Aetna may not deny or limit inpatient coverage or payment by substituting commercial screening criteria, such as MCG, if those commercial screening criteria yield a more restrictive result than the Two Midnight Rule. *See* 2023 Final Rule, at 22194.

41. CMS specifically stated: "MA plans may not use InterQual or MCG criteria, or similar products, to change coverage or payment criteria already established under Traditional Medicare laws." CMS further stated that "payment criteria for inpatient admissions at 42 CFR 412.3" (also known as the Two Midnight Rule) is a "general coverage and benefit condition[] included in Traditional Medicare laws." 2023 Final Rule, at 22194.

9

42.     If an admitting physician expects a medically necessary hospital stay crossing two or more midnights, the Two Midnight Rule supports the inpatient admission.  If Aetna were to "deny" the inpatient admission—whether by paying less for the admission and effectively treating it as an observation stay, or outright denying the admission—based solely on a purported failure to meet MCG screening criteria, then Aetna's conduct violates federal law that prohibits Medicare Advantage plans from applying standards more restrictive than Medicare coverage criteria.

43.     MCG criteria can be used as a "gap filler" where Medicare coverage criteria are not specified.[1]  But here, inpatient determinations are not "gaps" that need to be filled with MCG criteria because the Two Midnight Rule specifically governs inpatient admissions, as CMS reaffirmed in the Final Rule.

### III.     *Aetna's "Level of Severity Policy"*

44.     Despite this clear federal authority and guidance requiring Aetna to comply with the Two Midnight Rule and to provide "benefits" through "payment" for all services that are covered by Medicare Part A including inpatient services, Aetna implemented its "Level of Severity Inpatient Payment Policy" as a way to slash provider payments, all the while telling patients that they are being covered for an inpatient admission.

45.     Aetna's publication titled "Level of Severity Inpatient Payment Policy" provides the following explanation of the "Policy":

---

[1] When that occurs, the 2023 Final Rule imposes other requirements.  For instance, the Medicare Advantage plan may create internal coverage criteria, but such criteria must be "based on current evidence in widely used treatment guidelines or clinical literature that is made publicly available."  2023 Final Rule, at 22194.

Effective January 1, 2026, we are implementing a new Level of Severity Inpatient Payment Policy for Medicare and SNP inpatient claims.

The policy applies to providers whose contracts are paid based upon DRG/Medicare Allowable. When a Medicare member is urgently or emergently admitted to a hospital and an inpatient order has been submitted by the provider, we will authorize the inpatient stay if the stay is one midnight or greater.

- For hospital stays where the member stays at least one (1) midnight but less than five (5) midnights, we will perform a level of severity review to determine whether a claim will be paid at the higher or lower level of severity rate:
  - If the inpatient stay meets the severity criteria, eligible claims pay at the higher level of severity rate
  - Inpatient stays that do not meet the severity criteria will be paid at the lower level of severity rate.
- For hospital stays where the member stays five (5) midnights or greater, we will pay the higher level of severity rate i.e., we will not perform a severity review for hospital stays of five midnights or greater.

Under the payment policy, the MCG inpatient criteria will not be used to determine whether an inpatient stay is medically necessary.

Instead, the severity criteria will be used to determine the higher or lower level of severity payment rate.

Providers have the option to request a review of the severity determination (including the right to have a severity discussion with an Aetna medical director) and to appeal for the higher level of severity rate, if they believe the stay meets the severity criteria.

**Exhibit A**.

46. According to Aetna, the "Policy" applies to Medicare Advantage inpatient stays between one (1) and four (4) midnights for patients "urgently or emergently admitted to a hospital."

11

47.   The "Policy" provides that Aetna will "authorize" the inpatient stay but will pay Hospitals at a lower level of severity rate if the inpatient stay does not meet proprietary commercial screening criteria, referred to as MCG inpatient criteria.

48.   In other words, through this "Policy," Aetna has unilaterally created a two-tier rate structure for inpatient stays, depending on whether (in Aetna's sole determination) the inpatient stay meets MCG inpatient criteria, which may or may not be consistent with the Two Midnight Rule in given case.

49.   The Hospitals never agreed to a two-tier approach for payment for inpatient stays, and the parties never amended the Agreements pursuant to Section 9.2 of the Jefferson Health Agreement and Section 9.2 of the LVPHO Agreement to add any such tiered payment structure. At one point around the time Aetna implemented its "Policy," Aetna sent a proposed amendment to the Hospitals to change the payment for inpatient stays along the lines of what it seeks to do through the "Policy," but the Hospitals rejected it.

50.   Aetna's "Policy" violates the Two Midnight Rule, which provides that "an inpatient admission is generally appropriate for payment under Medicare Part A when the admitting physician expects the patient to require hospital care that crosses two midnights."   42 C.F.R. § 412.3(d)(1).

51.   Per the "Policy," Aetna says it is not making medical necessity determinations to determine whether the inpatient stay is appropriate.

52.   Aetna instead says it is conducting "level of severity" determinations as to whether the stay was "severe" enough to qualify for payment at an inpatient rate rather than a lower observation rate.

12

53.     Since January 2026, Aetna has been applying the "Policy" to the Hospitals.  In one case, Aetna deemed the following patient as "low severity":  A 72-year-old who presented with a prior Cerebrovascular Accident (stroke), altered mental status, and hypoxia who, after admission, had worsening respiratory failure requiring intubation with bilateral pneumonia and acute renal failure.  After the patient's second midnight in the hospital, Aetna determined the patient was "low severity," even though the patient was intubated in an ICU, had acute renal failure, and was administered broad spectrum IV antibiotics for multifocal pneumonia.  The admitting physician determined the patient's inpatient stay was medically necessary, but Aetna decided the patient was not "severe" enough to qualify for payment at an inpatient rate.  Only after the Hospital followed up and presented additional clinical information demonstrating the patient remained hospitalized after the fifth day did Aetna eventually approve the case as "high severity."

54.     However, the Two Midnight Rule does ***not*** speak in terms of "severity," nor does it provide a two-tier structure for coverage of inpatient admissions.  Instead, the Two Midnight Rule provides a bright line test based on the ***expectation of the physician that the patient requires hospital care that crosses two midnights***.

55.     In addition, whether Aetna calls its "Policy" a "coverage" rule or a "payment" rule, that is a distinction without a difference.  CMS has explained that "[w]hen determining whether Traditional Medicare criteria apply in MA, ***it is irrelevant whether Traditional Medicare considers the criteria part of a coverage rule or a payment rule, as both address the scope of items and services for which benefits are available to Medicare beneficiaries*** under Parts A and B."  88 Fed. Reg. 22120, 22191-92 (April 12, 2023) (emphasis added).

56.     Aetna's "Policy" also attempts to circumvent the Two Midnight Rule by relying on MCG inpatient criteria for the "severity" determinations, even though CMS confirmed that "MA

13

plans may not use InterQual or MCG criteria, or similar products, to change coverage or payment criteria already established under Traditional Medicare laws." 88 Fed. Reg. 22120, 22194 (April 12, 2023). Aetna's application of MCG criteria ultimately changes payment criteria for inpatient admissions defined by the Two Midnight Rule, however, which violates the Two Midnight Rule.

57. Aetna's "Policy" purports to use MCG inpatient criteria, but Aetna says that the screening criteria "will not be used to determine whether an inpatient stay is medically necessary. Instead, the severity criteria will be used to determine the higher or lower level of severity payment rate."

58. Aetna's application of MCG inpatient criteria to determine higher or lower level of severity payment is fundamentally wrong for several reasons. First, MCG criteria are commercial screening *guidelines* that can be useful to help guide the decision-making process for whether inpatient care is appropriate. MCG criteria are not designed to be used in isolation. As MCG recognizes: "Clinical decisions to admit to inpatient vs. observation (or outpatient) care are an area of ongoing scrutiny due to their impact on reimbursement. MCG care guidelines recognize that determinations for inpatient vs. observation status depend on individual patient assessments by clinicians, and as such, MCG decision support tools are designed to be used in conjunction with the clinical judgment of a healthcare professional." *See* MCG, The Value of Independent Clinical Guidelines (Jan. 23, 2024), available at https://www.mcg.com/blog/independent-clinical-guidelines/. Aetna **admits** that pursuant to its "Policy," it will use MCG inpatient criteria in isolation, without applying clinical judgment or the Two Midnight Rule.

59. Second, MCG does not issue or provide separate "severity of inpatient admission" guidelines or criteria. "Severity" of inpatient admission is a concept invented by Aetna. Thus,

14

Aetna is applying inpatient screening criteria for an entirely different purpose than what the criteria were designed for.

60. Aetna's "Policy" has resulted in administrative burden, financial strain, and confusion at the Hospitals, resulting in time spent in dealing with Aetna's "Policy" instead of providing patient care. For example, Aetna has misapplied the "Policy" even according to its own terms by inappropriately applying the "Policy" to cases involving five (5) or more midnights and paying the lower level of severity rate. This misapplication has created administrative burden on the Hospitals, who themselves must identify the errors and attempt to resolve them. The Hospitals have devoted significant resources to closely review the action on the accounts to determine if Aetna has made errors, and these efforts will exponentially increase as Aetna's underpayments continue to accrue.

61. Administrative burden also results from the utilization management teams having to constantly provide updated clinical information to Aetna and closely following Aetna's determinations in order to challenge them, and the appeals teams having to continually appeal Aetna's determinations that the lower level of severity payment rate applies and following up on those appeals.

62. In addition, in phone call discussions between the Hospitals' physician advisors and Aetna's medical directors, which occur when the Hospitals challenge Aetna's "lower severity" determination, Aetna requires the Hospitals' physician advisors to go through the MCG criteria and "check the box" to determine whether MCG criteria are met. This process makes discussions much longer and more cumbersome and diverts the physicians' attention away from other hospital patients that require their close attention.

15

63.     Similarly, the "Policy" has led to confusion as to whether the Hospitals can engage in peer-to-peer discussions relating to the medical necessity of the inpatient admission, because Aetna wrongly asserts that the "Policy" is not clinical in nature.  Therefore, opportunities for peer-to-peer discussion have declined, making it difficult for Hospitals to explain clinically why Aetna's "severity" determinations are wrong when applying clinical judgment (and not just MCG criteria).

64.     Application of the "Policy" has also had downstream effects that penalize the Hospitals for subsequent inpatient readmissions when Aetna pays for them at the lower level of severity level.  Because Aetna is not technically "denying" the first inpatient stay, Aetna treats subsequent inpatient stays as inappropriate "readmissions," which results in reduced reimbursement to Hospitals and places the burden on Hospitals to appeal and contest these cases.

65.     The implementation of the "Policy" has made it extraordinarily burdensome and futile for the Hospitals to try to address the denials and underpayments through the normal course of appeals.  To date, the Hospitals have not received any response from Aetna to any of the appeals that Hospitals have sent.  Each follow up action on submitted appeals creates additional work and burden on the Hospitals' staff.

66.     The Aetna "Policy" also has the potential to cause patient confusion and frustration directed toward the Hospitals.  The Hospitals' general practice is to wait to bill patients for their deductibles or co-pays when the accounts are in the appeals process, because the ultimate determination may impact the amounts owed by the patient.  As a result, patients impacted by this "Policy" will not receive a bill from the Hospitals until the appeals are resolved (and, as noted, Aetna still has not responded to a single appeal).  Based on the Hospitals' experience, it is likely that patients will become frustrated with the Hospitals when they are confronted with amounts owed as co-pays or deductibles many months after the care was provided.

67. In addition, specific to Jefferson Health, the "Policy" violates the contractual requirement that Aetna's concurrent review of an inpatient admission may only begin once the stay reaches ten (10) days, whereas the "Policy" review and applies "severity criteria" for lengths of stay between one (1) and five (5) days.

68. Moreover, specific to LVPHO, the "Policy" violates the contractual requirement that Aetna comply with the Two Midnight Rule.

69. The Hospitals have engaged in dispute resolution with Aetna. The Hospitals sent Aetna a written notice of dispute concerning the Aetna's "Policy" on August 19, 2025, explaining that not only does the "Policy" breach the contracts, but it also violates the Two Midnight Rule.

70. On November 18, 2025, Aetna responded to the Hospitals, refusing to withdraw application of the "Policy."

71. On December 18, 2025, the Hospitals responded to Aetna's letter, stating that Aetna's letter and the "Policy" itself appear "calculated to try to get around the Two Midnight Rule by defining inpatient services differently for payment than for all other purposes. Aetna cannot unilaterally choose to redefine inpatient admissions as outpatient for rate purposes and promise to treat the services as inpatient for all other purposes. That is not the law, nor is it the agreement reached by the parties in their Agreements."

72. Aetna continues to apply its "Policy" to the Hospitals in contravention of federal law, specifically, the Two Midnight Rule, and in violation of the Agreements.

## COUNT I

## BREACH OF CONTRACT – SPECIFIC PERFORMANCE

73. The Hospitals re-allege each allegation contained above as if fully set forth herein.

17

74.     At all relevant times, valid and enforceable contracts existed between the Hospitals and Aetna, namely, the Jefferson Health Agreement and the LVPHO Agreement.  The Agreements were supported by adequate consideration and are binding contracts.

75.     Pursuant to the Agreements, Aetna is required to comply with all applicable laws and regulations.  One such federal law is the Two Midnight Rule.  The obligation of Aetna to comply with the law is a material term of the Agreements.

76.     In addition, pursuant to the Agreements, Aetna cannot change the reimbursement rates without a written amendment signed by both parties.

77.     The Hospitals have complied with all conditions and obligations required of the Hospitals under the Agreements.  In the alternative, Hospitals' performance has been excused.

78.     Aetna breached the Agreements through implementation of its "Policy," which violates the Two Midnight Rule and constitutes an improper unilateral reimbursement rate without written amendment.  Aetna's conduct materially breaches the Agreements.

79.     As a result of Aetna's breach of the Agreements, the Hospitals have suffered harm, including but not limited to loss in reimbursement rate for inpatient hospital services and significant administrative burden.  Aetna's actions also improperly negate the clinical judgment and decision-making of Hospitals' admitting physicians.

80.     The Hospitals request specific performance that Aetna comply with the terms of the Agreements and pay the contracted inpatient reimbursement rate for inpatient admissions that meet the Two Midnight Rule.

## COUNT II

## DECLARATORY JUDGMENT

81.     The Hospitals re-allege each allegation contained above as if fully set forth herein.

82.     The Hospitals are entitled to, and this Court has the power and authority to grant, declaratory relief under the provisions of the Declaratory Judgment Act, 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57, and to have its rights under the Agreements and applicable law to be decided and declared presently.

83.     "Declaratory judgments are equitable in nature[.]" *Fenton v. Balick*, 821 F. Supp. 2d 755, 762 (E.D. Pa. 2011) (citing *Building Ind. Ass'n of Lancaster Cnty. v. Manheim Twp.*, 710 A.2d 141, 146–47 (Pa. Commw. Ct.1998).

84.     Pursuant to Federal Rule of Civil Procedure 57, the "court may order a speedy hearing of a declaratory-judgment action."

85.     An actionable, justiciable controversy exists between the Hospitals and Aetna regarding whether Aetna's application of the Level of Severity "Policy" violates the Two Midnight Rule and the parties' Agreements.

86.     Hospitals contend that the "Policy" violates the Two Midnight Rule and constitutes an improper unilateral amendment of the Agreements.

87.     Aetna, by contrast, has taken the position that the "Policy" complies with the Two Midnight Rule, that Aetna is permitted to implement "payment policies," and that the "Policy" is a "payment policy" that does not amend the Agreements.

88.     The parties require a determination of their respective rights and duties relating to the "Policy." There is a substantial, continuing controversy between the parties of sufficient immediacy and reality as to warrant the issuance of a declaratory judgment. The controversy is not hypothetical or abstract but involves a definite and concrete dispute touching the legal relations of parties having adverse legal interests.

19

89. The Hospitals are in present and immediate need of a declaration of their rights with respect to these issues because Aetna's "Level of Severity Inpatient Payment Policy" has created uncertainty regarding the parties' respective rights and obligations under the Agreements and under applicable law. Absent a judicial declaration, Hospitals will continue to suffer harm in the form of administrative burden that is so significant that it could impact patient care and contribute to patient confusion regarding patient financial obligations.

90. The Hospitals request an expedited declaratory judgment that Aetna's "Policy" violates federal law, i.e., the Two Midnight Rule, and that Aetna cannot apply the "Policy" as to the Hospitals without a contractual amendment.

91. An expedited declaratory judgment will serve a useful purpose in clarifying and settling the legal relations at issue and will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to this proceeding.

## PRAYER FOR RELIEF

**WHEREFORE**, the Hospitals pray that the Court grant the following relief:

(i) Enter a declaratory judgment that (a) applicable federal law and the Agreements require Aetna to comply with the Two Midnight Rule for claims for inpatient services for Aetna members, (b) Aetna's "Policy" violates the Two Midnight Rule, and (c) Aetna may not unilaterally implement this "Policy" without a contractual amendment.

(ii) Enter an injunction enjoining Aetna from implementing the "Policy" as to the Hospitals;

(iii) Award all costs and disbursements of this action, including reasonable attorneys' fees and expenses; and

20

(iv)    Such other and further relief as the Court deems just and proper.

Respectfully submitted this 6th day of April, 2026.

COZEN O'CONNOR

*/s/ Aaron Krauss*

Aaron Krauss (62419)
One Liberty Place
1650 Market Street Suite 2800
Philadelphia, Pennsylvania 19103
Tel.: (215) 665-4181
AKrauss@cozen.com

KING & SPALDING LLP
James W. Boswell (*pro hac vice application forthcoming*)
Georgia Bar No. 069838
Jennifer S. Lewin (*pro hac vice application forthcoming*)
Georgia Bar No. 397958
1180 Peachtree Street, N.E.
Atlanta, Georgia  30309
Tel.:  (404) 572-3534
jboswell@kslaw.com
jlewin@kslaw.com

*Counsel for Plaintiffs*